Filed 12/29/23  In re D.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re D.W., a Person Coming Under the Juvenile Court Law.

|  |  |
|---|---|
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E081206 |
| Plaintiff and Respondent, | (Super.Ct.No. J282924) |
| v. | OPINION |
| D.W., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Erin K. Alexander, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Tiffany Lok and Landon Villavaso, Deputy County Counsel, for Plaintiff and Respondent.

1

D.W. (father) appeals from an order terminating his parental rights to his daughter D.W. (the child). Father contends the juvenile court erred (1) by denying his petition under Welfare and Institutions Code section 388[1] for return of the child to his custody, and (2) by finding inapplicable the parental benefit exception to termination of parental rights. We find no error and affirm the order.

I.

FACTS AND PROCEDURAL BACKGROUND

The child was referred to San Bernardino County Children and Family Services (CFS) when she tested positive for methamphetamines at birth. Mother told a social worker she had three other children who were not in her custody; two children lived with her brother and the third child lived with his father in Las Vegas, Nevada. Mother admitted to having drank alcohol twice a week and using methamphetamines during her pregnancy. Mother was not married to the child's father at the time of the child's birth. Father was not present for the birth and did not sign the birth certificate.

CFS detained the child from her parents and filed a petition alleging the child was a dependent under section 300, subdivisions (b) and (g). Mother and father appeared at the detention hearing. Mother named father as the child's biological father, and he did not deny paternity. The juvenile court found a prima facie case had been made that the child was a dependent and set a combined jurisdictional and dispositional hearing.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

In its report for the jurisdiction and disposition hearing, CFS reported that mother admitted to having used cocaine since she was 14 years old, but she only admitted to having used methamphetamines once before the child's birth. Father denied using drugs or engaging in domestic violence. Father was incarcerated in October of 2019 for striking a grocery store worker.

In a report for a contested jurisdiction hearing, CFS reported that mother disclosed ongoing domestic violence between herself and father for the past year. Mother reported an incident during which she sustained three concussions and father had been arrested for corporal injury to a spouse or cohabitant. CFS filed a first amended petition alleging counts under section 300, subdivisions (b), (g), and (j). At the close of the contested hearing, the juvenile court sustained the amended petition and declared the child to be a dependent of the court. The juvenile court found father to be the presumed father of the child and ordered CFS to offer family reunification services to mother and father.

In its report for the six-month review hearing, CFS reported that father had been released from custody and had reportedly started his parenting and anger management classes. Father had consistent video visits with the child beginning May 19, 2020, and began in-person visits on July 1, 2020. At the review hearing, the juvenile court ordered that both parents continue to receive reunification services.

The report submitted for the 12-month review hearing stated CFS had limited contact with mother during the reporting period. Mother failed to drug test and had limited visitation with the child. Father continued to work on his case plan but had not

yet completed parenting or domestic violence classes. Father reported for individual counseling, but, according to the licensed clinical social worker assigned to him, father minimally participated in the first session and he appeared confused about "the reason for treatment which is concerning and [he] continues to be a risk for the child." Moreover, when questioned by CFS about domestic violence in his relationship with mother, "father became upset . . . and stated the domestic violence allegations are not true." He told the social worker to "stop harassing him" and asked that he be assigned to another one.

At the 12-month status review hearing, the juvenile court found father made substantial progress on his case plan and there was a substantial probability the child could be returned by the next hearing date. The court ordered that mother and father continue receiving reunification services.

The report filed for the 18-month review hearing reported the child's maternal uncle was in the process of becoming a resource family home to have the child placed with him. Father completed his parenting classes, domestic violence classes, and individual counseling. Father had three on-demand drug tests during the reporting period and tested negative twice with one "no show." The social worker made multiple attempts to assess father's home, but no assessment had been conducted at the time of the report. The report described the child as happy, bonded to her foster family, and developing a bond with her maternal uncle. Father visited with the child consistently, but only video teleconferencing once a week for about six to 11 minutes.

At the close of the 18-month review hearing, the juvenile court terminated mother's and father's reunification services but ordered six months of discretionary services and ordered a permanent plan of placement with a fit and willing relative and legal guardianship.

In an additional status review report, CFS reported a social worker had attempted to arrange an in-person visit between father and the child on Father's Day, but father declined and said he would have video visits instead because was not available. Father had still not made himself available to complete a home assessment by CFS. The child had been placed with her maternal uncle, and the social worker described her as a happy toddler with no reported concerns. The child's caretakers reported the child recognized her father and enjoyed visits with him. Previously, the child would reach out for her caretakers during visits with father, but this behavior ceased.

During a permanent placement plan hearing, the juvenile court terminated discretionary services to mother and father and set a hearing under section 366.26.

In an information update, CFS reported the child's caretakers were requesting to adopt the child. The caretakers stated they wanted to give the child stability and to provide for her to go on to college. The caretakers supported continuing the relationship between father and the child, including weekly unsupervised visits.

In its report for the section 366.26 hearing, CFS reported the child was very secure, happy, and thriving in her placement. At the caretaker's home, the child shared a

5

bedroom with her 10-year-old maternal half sister. Father continued to have unsupervised visits with the child once a week for four hours.

The juvenile court granted father's request for a bonding study. A further section 366.26 hearing was scheduled for July 27, 2022. The examiner observed father and the child during a single visit at a park and reviewed the most recent information update submitted to the juvenile court by CFS. The examiner reported the child referred to father as "Daddy" and generally exhibited calmness and continued positive emotions toward father during their interactions. The child was described as relaxed and curious, and being separated from father did not cause her to become overly emotional. The examiner concluded father and child "have a healthy (secure) attachment pattern." Because of the existing relationship, the examiner indicated that "severing contact could be detrimental" to the child, and recommended the juvenile court consider the healthy and secure relationship with the father "when making any determinations regarding the future of all parties."

Father filed a petition pursuant to section 388 and requested the juvenile court order the child returned to father's custody under family maintenance. Father alleged there was a change in circumstance because he continued to have unsupervised visits with the child, he obtained appropriate housing, and he had reunified with the child's half sister. Father argued he had already completed his case plan and, now that he had appropriate housing, he could provide the child with long-term stability. Finally, father argued it would be in the child's best interest to live with her sister and father.

6

In its response to the petition, CFS reported father's child welfare case in Los Angeles County had closed and he had reunified with the child's half sibling. According to the child's caretakers, father was inconsistent with his visits and sometimes went two weeks without seeing the child. The caretakers reported concerns about the child's stability. The child exhibited hyperactivity after visits with father and the caretakers had concerns as to how father would respond to the child's tantrums given his limited interactions with her.

When interviewed by the social worker father said the child needed her mother and father in her life. He was unable to describe the relationship between the child and her half sibling. Father was also unable to say what he believed had caused his case to get to the point where his parental rights might be terminated, saying, "I don't know, my attorney did not explain it to me, the other social worker did not explain anything, I am just going with the flow, whatever happens happens." Finally, father had still not made himself available for a home assessment, stating "he had more important things to do." CFS recommended the juvenile court deny father's petition.

The juvenile court set an evidentiary hearing on father's petition to be heard the same day as the permanency hearing. The court ordered CFS to attempt to assess father's home. CFS reported that father's home was finally assessed and there was no evidence of unsafe or hazardous objects in the home. The juvenile court ordered that father be provided with a minimum of one overnight visit a week based on the positive home assessment.

In yet another information update, CFS reported the social worker had interviewed the caretakers who repeated their desire to adopt the child. The child was bonded to and looked up to her older sister who also lived with the caretakers. CFS opined it was in the child's best interest to remain in the caretaker's home, where she has been placed for nearly two years. CFS reported father had been unable to proceed with an overnight visit scheduled for the weekend of February 3, 2023, because he would be out of town. Father had an overnight visit the following weekend. CFS requested the overnight visits cease pending the next court hearing due to the child's negative behaviors. The juvenile court ordered overnight visits to continue at a minimum of one time a week.

In a further information update, CFS stated the caretakers had reported the child had been exhibiting negative behaviors such as spitting, slobbering, and talking like a baby. The child had also refused to feed herself and demanded chips and candy before breakfast. The child was referred to UCLA Mental Health.

At the continued hearing, father testified he visited with the child on Sundays and would take her to the park or have lunch. Father testified, "Whatever she want [sic], she say she want [sic] candy I give her candy. She want [sic] to go to the park. We go to the park. Walmart. I get her toy. We go to the house. We watch movies. We paint." Appellant testified he sometimes called the child throughout the week, but not always. When the child needed to be redirected because she was upset, father would buy her a doll to improve her mood. He had received a job offer from Walmart as an overnight stocker and, if the child were returned to his custody, he planned to either enroll the child

in Kinder Care or have his sister take care of the child while he was at work.  Father described his bond with the child as "strong" and testified they have a good time when they were together.  Father also testified the child had a good relationship with her half sister.

On cross-examination, father testified he bought the child a toy every time they had an overnight visit.  When asked if he believed he had "any role in the reason these proceedings opened up?," father answered, "No.  No."  When describing the incident with mother for which he was arrested for domestic violence, father testified he had merely gotten into an "argument" with mother, and she had called the police.  When asked why the mother had been taken away in an ambulance, father testified, "She faked the whole thing."  When asked about the child's half sibling, father testified she had lived with him for the first five years of her life before being removed by the child welfare agency in Los Angeles County.  Father testified he did not know why the half sibling had been removed from his care except that he was in jail at the time.  Finally, father denied having any responsibility for the fact the child had been in the juvenile court system for three and a half years and he denied as "false" the allegations that he engaged in domestic violence with the mother.

The court set a further hearing for argument and a decision.

At the continued hearing, the juvenile court denied father's petition, indicating there was no change in circumstances and, notwithstanding father's testimony about a strong bond with the child, granting the petition would not be in the child's best interest

9

because she had never lived with father. With respect to a permanency plan, the juvenile court found father was not a credible witness. "It seemed like [father] was primarily interested in telling this Court what I would need to hear in order to secure the relationship or the custody of his child. [¶] And, unfortunately for him, he failed to understand that by acknowledging his past mistake, i.e., the domestic violence that would have bolstered his credibility, but instead he decided to just deny everything which, in fact, destroyed his credibility." The juvenile court found that the parental benefit exception to termination of parental rights did not apply. "The Court finds that the [*In re Caden C.* (2021) 11 Cal.5th 614] factors have not been met mainly because of the third prong that, in fact, from the 6.7's the Court has read, as well as other reports, there seems to be a detriment to [the child] in that this father does not know how to parent his child. When the child is back in the custody of the caregivers, who seemingly know what they are doing, they notice that the child has regressed. She is sucking her thumb. She is talking baby talk. She needs to be cuddled. She refuses to go to sleep. She is more prone to throw tantrums when she doesn't get her way. All of this does nothing to help [the child] to develop in a healthy way."

Therefore, the juvenile court terminated mother's and father's parental rights and freed the child for adoption.

10

## II.

## DISCUSSION

A. *Section 388 Petition.*

"At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that a change in placement is in the child's best interests. [Citation.] A modification petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion. [Citation.] A proper exercise of discretion is '"not a capricious or arbitrary discretion, but an impartial discretion, guided and controlled in its exercise by fixed legal principles . . . to be exercised in conformity with the spirit of the law[,] and in a manner to subserve and not to impede or defeat the ends of substantial justice."' [Citation.] Exercises of discretion must be '"grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue."' [Citation.] '"The denial of a section 388 motion rarely merits reversal as an abuse of discretion."'" (*In re D.P.* (2023) 92 Cal.App.5th 1282, 1291.) Generally, the parent bears the burden of proving changed circumstances and best interest of the child by a preponderance of the evidence.[2] (*In re A.A.* (2012) 203 Cal.App.4th 597, 611-612.)

---

[2] CFS contends the juvenile court may only grant a section 388 petition if it finds by clear and convincing evidence that the proposed change is in the child's best interest. But that heightened standard of proof only applies when the petition seeks to modify any order related to custody or visitation of a child for whom the juvenile court entered an order bypassing reunification services under section 361.5, subdivision (b)(4), (b)(5), or

*[footnote continued on next page]*

"It is true a parent and a child share a fundamental interest in reuniting up to the point at which reunification efforts cease. [Citation.] However, the interests of the parent and the child have diverged by the point of a [section 366.26] hearing to select and implement a child's permanent plan. [Citation.] '[C]hildren have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' [Citation.] Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child."[3] (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

_____

(b)(6). (§ 388, subd. (a)(2); see *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194.) Here, reunification services were ordered for both parents.

[3] With respect to whether returning the child to father's custody would be in the child's best interest, father directs us to the nonexhaustive list of factors set forth in *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532: "(1) The seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers;

*[footnote continued on next page]*

"'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] "'[C]hildhood does not wait for the parent to become adequate.'"'" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.) "The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] In other words, the problem that initially brought the child within the dependency system must be removed or ameliorated." (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 612.)

Father's claim of error with respect to the denial of his petition under section 388 fails for the simple reason that he made no showing whatsoever in the juvenile court of new evidence or a change of the most *relevant* circumstance that gave rise to the dependency. From the very beginning of the proceedings, father denied having engaged

and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been."

The very same court that decided *In re Kimberly F.* has since rejected the application of those factors when, as here, the juvenile court has terminated reunification services and set a section 366.26 hearing for selection of a permanent plan. "[W]e decline to apply the *Kimberly F.* factors if for no other reason than they do not take into account the Supreme Court's analysis in *Stephanie M.*, applicable after reunification efforts have been terminated. As stated by one treatise, 'In such circumstances, the approach of the court in the case of . . . *Kimberly F.* . . . may not be appropriate since it fails to give full consideration to this shift in focus.' [Citation.] We instead follow the direction of our Supreme Court, holding that after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.) In any event, as indicated *post*, we need not decide whether returning the child to father's custody would have been in her best interest.

13

in domestic violence with mother. In contrast, mother informed the social worker that she and father had engaged in domestic violence for the past year and that during one incident she suffered three concussions and father was arrested. The juvenile court sustained the domestic violence allegations in an amended petition and declared the child to be a dependent.

Although father worked on his case plan during the proceedings, and he completed a domestic violence class, he clearly gained no insight into the reasons for the dependency. After father's first individual counseling session, the clinician reported father appeared to be confused about why he needed counseling in the first place. And when a social worker from CFS asked father about domestic violence, he became upset, said the allegations were untrue, accused the social worker of harassment, and asked to be assigned to another one.

Father gained no further insight during the long interval between termination of reunification services (including discretionary ones) and when he filed his petition. When interviewed by the social worker, father continued to report he did not understand the reasons for the dependency and claimed his attorney and the social worker had not explained anything to him. And, while testifying in support of his petition, father refused to take any responsibility for the fact the child had been removed from his custody and he once again denied having engaged in domestic violence and instead claimed mother had faked the whole incident (and, presumably, her injuries). The juvenile court specifically

14

found father's testimony to not be credible, and we cannot second guess that finding. (See *In re L.S.* (2014) 230 Cal.App.4th 1183, 1194.)

Because father made no showing of significant changed circumstances, the juvenile court correctly denied his petition and we need not address father's additional argument that returning the child to his custody would be in the child's best interest.

B.  *Parental Benefit Exception.*

"When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that termination would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630-631.)  'Adoption, where possible, is the permanent plan preferred by the Legislature.'  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573; see *In re Celine R.* (2003) 31 Cal.4th 45, 53 ['adoption is the norm.'].)  '"[B]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."'  (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)"  (*In re I.E.* (2023) 91 Cal.App.5th 683, 690.)

"One exception is commonly called the parental benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  The parent carries the burden of establishing the exception by a preponderance of the evidence (*In re Caden C.*, *supra*, 11 Cal.5th at p. 636), meaning the parent must prove it is '"more likely than not"' the exception applies (*Conservatorship of*

15

*O.B.* (2020) 9 Cal.5th 989, 995). To establish that the parental benefit exception applies, the parent must show three things: 'The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.' (*In re Caden C.*, at pp. 636-637.)" (*In re I.E.*, *supra*, 91 Cal.App.5th at pp. 690-691.)

"Our review of the juvenile court's ruling on whether the parental benefit exception applies incorporates both the substantial evidence and the abuse of discretion standards. (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 639-641.) We apply the substantial evidence standard of review to the first two elements of the exception and the abuse of discretion standard to the third element. (*Ibid.*) 'On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order.' (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) Under the abuse of discretion standard of review, we determine whether the juvenile court's decision exceeded the bounds of reason and, in

16

so doing, we cannot substitute our view for that of the juvenile court.  (*In re Caden C*., at p. 641; *In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)"  (*In re I.E.*, *supra*, 91 Cal.App.5th at p. 691.)

"'Assessment of the first component is "quantitative and relatively straightforward, asking whether visitation occurred regularly and often." [Citation.]  It is an evaluation of "whether the parent consistently has contact with the child." [Citation.] "'Sporadic visitation is insufficient.'"'  (*In re A.G.* (2020) 58 Cal.App.5th 973, 994-995.) 'Visits and contact "continue[] or develop[] a significant, positive, emotional attachment from child to parent." [Citation.]  Courts should consider in that light whether parents "maintained regular visitation and contact with the child" (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact—here as throughout, the focus is on the best interests of the child.' (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)"  (*In re I.E.*, *supra*, 91 Cal.App.5th at pp. 691-692.)  "For the second element, 'the focus is the child.  And the relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." [Citation.]  . . . [C]ourts often consider how children feel about, interact with, look to, or talk about their parents. [Citations.]  Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do "[p]arent-child relationships" conform to an entirely consistent pattern.' (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)"  (*In re I.E.*, p. 692.)

Although the juvenile court stated on the record that it found neither of the three factors had been satisfied, the court focused its attention on the third factor. Moreover, on appeal CFS does not expressly argue father did not regularly visit with the child. For purposes of this opinion, we will assume, without deciding, that the first and second factors have been satisfied.

"As to the third element, courts must 'determine . . . how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.' ([*In re Caden C.*, *supra*, 11 Cal.5th] at p. 633.) 'That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]"' (*Ibid.*)" (*In re I.E.*, *supra*, 91 Cal.App.5th at p. 692.)

The record contains no evidence that the child was sad or distressed at having to part from father at the end of their visits, "which tends to support the juvenile court's conclusion that the relationship was not so substantial that its severance would be detrimental to the child." (*In re I.E.*, *supra*, 91 Cal.App.5th at p. 692.) When addressing the third factor, the juvenile court indicated that, not only would the child suffer no detriment from termination of the parental relationship, but she would suffer detriment from its continuance because "this father does not know how to parent his child." As the court indicated, the child was happy and stable in her caregiver's home yet after visiting father the child regressed and acted like a baby, which "does nothing to help [the child] to

18

develop in a healthy way." The record supports the juvenile court's finding that the child's behavior worsened or regressed because of father's poor parenting during those visits. For instance, father testified that if the child threw a tantrum, he merely babied her and bought her toys rather than effectively redirect her behavior.

Besides father's testimony, the only evidence in the record about a detriment to the child from termination of parental rights consists of the bonding study. But the study was based on the examiner's observation of the father and the child during a single visit. The examiner observed the child to be affectionate with father and to interact positively with him, but the report included no information from which the juvenile court could conclude the child would suffer significant detriment. At most, the examiner hypothesized the child would have difficultly processing the "ambiguous loss" of a healthy parent-child relationship "*without significant reason* (e.g., an unhealthy or unsafe parent)" (an unsupported assumption on the part of the examiner), and the examiner recommended the court consider the healthy attachment when making decisions about the child's future. (Italics added.)

Because the record contains no evidence the child would suffer significant detriment from the loss of her parental relationship with father, the juvenile court correctly ruled the parental benefit exception does not apply.

III.

19

DISPOSITION

The order terminating father's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.